USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 11/13/14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------- x
                                                          :
IN RE WORLD TRADE CENTER LOWER          :   Docket: 21-mc-102
MANHATTAN DISASTER SITE LITIGATION      :
                                                          :
--------------------------------------------------------- x
WALDEMAR ROPEL, ET AL.,                  :   **ORDER AND OPINION**
                                                          :   **DENYING IN PART AND**
                                 Plaintiffs,      :   **GRANTING IN PART**
                                                          :   **DEFENDANTS' MOTIONS**
               -against-                          :   **FOR SUMMARY JUDGMENT**
                                                          :   **TO DISMISS THE**
233 BROADWAY OWNERS LLC, ET AL.,       :   **COMPLAINT**
                                                          :
                                 Defendants.    :   Case Number: 06-cv-1520
                                                          :
--------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

         In this action, Plaintiffs Waldemar Ropel and Krystyna Ropel assert claims for

common law negligence and violations of sections 200 and 241(6) of the New York Labor Law.

The claims are based upon injuries Waldemar Ropel allegedly suffered after working in

numerous buildings in the vicinity of the World Trade Center site in the weeks, months, and

years following the 9/11 terrorist attacks.  Ropel asserts his claims against various owners,

managing agents, lessees, environmental consultants, and contractors (collectively,

"Defendants") that owned, managed, or worked in the buildings.

         The Defendants have moved for summary judgment to dismiss the claims against

them.  The owners, managing agents, and lessees moving for summary judgment are: R.Y.

Management Company Inc., Hudson View East Condominium, Board of Managers of the

Hudson View East Condominium, 88 Greenwich LLC, Black Diamonds LLC, National

1

Association of Securities Dealers, Inc.,[1] General Reinsurance Corp., Merrill Lynch & Co., Inc.,[2] Moody's Holdings, Inc., Brookfield Financial Properties, Inc.,[3] and the Bank of New York Mellon Corporation (collectively, the "Owner Defendants"). The environmental consultants moving for summary judgment are: Hillmann Environmental Group, LLC, Weston Solutions Inc. (together, the "Environmental Consultant Defendants"), and Indoor Environmental Technologies, Inc. ("IET"). The only contractor moving for summary judgment is Blackmon-Mooring Steamatic Catastrophe, Inc. ("BMS"). For the following reasons, the Defendants' motions are granted in part and denied in part.

## I.    Background[4]

This opinion is one more in a series of opinions resolving numerous motions for summary judgment filed by defendants in cases arising from abatement work performed by various plaintiffs in the buildings surrounding the World Trade Center site in the aftermath of the September 11, 2001 terrorist attacks. I previously provided the relevant background facts in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 (S.D.N.Y. Sept. 9, 2014). For this reason, familiarity with the facts is assumed and this opinion will describe only the facts relevant to my disposition of the issues particular to the motions at issue here.

### A.    2 World Financial Center

---

[1] The National Association of Securities Dealers, Inc. also moves on behalf of the following entities: The New York City Industrial Development Agency, New York City Economic Development Corporation, Nasdaq Stock Market, Inc., The American Stock Exchange, LLC, American Stock Exchange Clearing, LLC, and American Stock Exchange Realty Associates LLC.

[2] Merrill Lynch & Co., Inc. also moves on behalf of the following entities: Battery Park City Authority, WFP Tower B Co., G.P. Corp., and WFP Tower B Co. L.P.

[3] Brookfield Financial Properties, Inc. also moves on behalf of the following entities: Brookfield Properties OLP Co. LLC (f/k/a BFP One Liberty Plaza Co. LLC), Brookfield Financial Properties, L.P., WFP Tower B Co. L.P., and WFP Tower B Co. GP Corp.

[4] The facts stated here are either undisputed or presented in the light most favorable to Ropel, as the non-moving party. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

2

2 World Financial Center is located directly west of the World Trade Center site, across West Street, an eight-lane major roadway.  On September 11, 2001, Brookfield Financial Properties L.P. ("Brookfield") owned WFP Tower B Co. L.P., which, in turn, owned 2 World Financial Center and leased the building to Merrill Lynch & Co., Inc. ("Merrill Lynch").  *See* Aff. Daniel M. Kindbergh Supp. Merrill Lynch Mot. Summ. J. ("Kindbergh Aff.") ¶ 3.  Battery Park City Authority ("BPCA") was the ground lessor.  *See* Decl. Philip Goldstein Supp. Merrill Lynch Mot. Summ. J. ("Goldstein Decl."), Exh. X at 16:13-18.  2 World Financial Center sustained substantial damage to its eastern façade as a result of the terrorist-related crashes into the Twin Towers of the World Trade Center on September 11, 2001 and their ensuing collapse, causing a significant infiltration of dust and debris.  *See id.*, Exh. O at 0017784.  The "Winter Garden," a glass-enclosed lobby connecting 2 World Financial Center and 3 World Financial Center, suffered severe structural damage including broken windows and demolished walls.  *See* Decl. Gregory J. Cannata Supp. Pls.' Opp'n Defs.' Mots. Summ. J. ("Cannata Decl."), Exh. 139.

Merrill Lynch retained Weston Solutions, Inc. ("Weston") and GPS Environmental Consultants, Inc. ("GPS") to test and analyze the dust and debris inside 2 World Financial Center.  *See* Goldstein Decl., Exh. O, Exh. T at 118:13-119:15.  Beginning September 26, 2001, Weston conducted comprehensive testing for numerous potential air contaminants, including asbestos, fibrous glass, heavy metals, and volatile organic compounds.  *See id.*, Exh. K. After both GPS's and Weston's air testing revealed the presence of asbestos, both allegedly advised Merrill Lynch to implement asbestos-specific procedures.  *See id.*, Exh. O, Exh. S at 103:18-105:18.  Weston, however, denies that it advised Merrill Lynch with respect to the asbestos abatement.  *See* Decl. Nicholas Kauffman Supp. Weston Mot. Summ. J. ("Kauffman Decl."), Exh. O ¶¶ 5-7.  There is no evidence that Weston tested the pH level of the dust.  *See,*

*e.g.*, Cannata Decl., Exh. 123. While Weston denies directly supervising the abatement workers or developing a safety protocol for the general abatement work at 2 World Financial Center, *see* Kauffman Decl., Exh. O ¶¶ 5-7, it did create a remediation protocol and provided project monitoring for mold abatement conducted in the basement, *see id.*, Exh. O ¶ 8. Ropel also presents evidence that Weston oversaw "all phases" of the cleanup work at 2 World Financial Center. *See* Cannata Decl., Exh. 4 at 106:3-107:16.

   Certain tenants at 2 World Financial Center retained Hillmann Environmental Group, LLC ("Hillmann") as their environmental consultant. *See* Decl. Salvatore J. Calabrese Supp. Hillmann Mot. Summ. J. ("Calabrese Decl."), Exh. C, ¶¶ 20-42. Hillmann did not have any agreement with Merrill Lynch nor did it perform any work for Merrill Lynch. *See id.*, Exh. C ¶ 20. However, Hillmann did conduct environmental monitoring during and after the cleanup and conducted an asbestos survey for Brookfield in the retail space. *See id.*, Exh. C ¶¶ 32, 43-46.

   Merrill Lynch retained Pinnacle Environmental Corporation ("Pinnacle") and BMS to conduct the cleanup work. *See* Goldstein Decl., Exh. M, Exh. O. The project began on September 24, 2001 and consisted of three phases: bulk cleanup, fine cleaning, and cleaning of the building's HVAC system. *See id.*, Exh. O. Pinnacle workers also conducted the mold abatement in the basement levels. *See* Kauffman Decl., Exh. O ¶ 8. Because initial environmental testing revealed asbestos levels above 1%, Pinnacle implemented asbestos abatement procedures during the cleanup. *See* Goldstein Decl., Exh. M at 2. BMS performed work at 2 World Financial Center between October 18, 2001 and August 27, 2002. *See* Decl. Frank Keenan Supp. BMS Mot. Summ. J. ("Keenan Decl."), Exhs. 17-20. During that time, BMS supervised certain Pinnacle workers. *See id.*, Exh. 21. Throughout the remediation, GPS

and Weston provided continuous air monitoring and safety consulting. *See* Goldstein Decl., Exh. G, Exh. O, Exh. T at 118:13-24, 194:11-23.

On October 19, 2001, IET conducted a single post-cleanup testing of the HVAC system for asbestos, lead, and microbial contamination. *See* Aff. John Stanley Supp. IET Mot. Summ. J. ("Stanley Aff.") ¶ 4, Exh. A. Beginning in February 2002, IET provided limited consulting services and project management for environmental testing of the HVAC system at 2 World Financial Center. *See id.*, Exh. B, Exh. D. IET presents evidence that it neither developed safety protocols for the abatement work performed by Pinnacle nor directly supervised Ropel's work. *See id.* ¶¶ 13-15.

Ropel, a licensed asbestos handler and member of Local Union 78, was hired by Pinnacle to perform cleanup work at 2 World Financial Center. *See* Goldstein Decl., Exh. B. He worked at 2 World Financial Center between September 24, 2001 and October 22, 2001 for approximately 206 hours. *See id.*, Exh. A, Exh. B. Ropel did not work for BMS at 2 World Financial Center. *See* Keenan Decl., Exh. 22, Exh. 23. His work consisted of bagging and removing dust and debris, disassembling furniture, cutting open the HVAC ducts to clean inside, and removing tiles and moldy sheetrock in the basement. *See* Cannata Decl., Exh. 63 at 249:2-20, 258:21-259:9, 261:20-262:16, 266:2-9. Other workers removed metal studs and sheetrock. *See id.*, Exh. 53 at 239:2-23, Exh. 54 at 352:23-353:6. Ropel wore a respirator and an asbestos suit with gloves while working. *See, e.g., id.*, Exh. 63 at 269:15-21. Replacement suits and gloves were unavailable. *See id.*, Exh. 63 at 270:8-10.

### B.     1 Liberty Plaza

1 Liberty Plaza is located one block east of the World Trade Center site. At the time of the World Trade Center attacks it was owned by Brookfield Properties OLP Co. LLC and

5

managed by Brookfield Financial Properties, LP (together, "Brookfield OLP"). *See* Smith Decl., Exh. C at 24:1-25:18. The building sustained moderate damage, consisting of broken windows and an infiltration of World Trade Center dust and debris. *See* Cannata Decl., Exh. 7 at 7-2, Exh. 19H. Pursuant to an oral agreement, Brookfield OLP retained Hillmann to test the dust and debris for multiple toxins, prepare a "health and safety plan," and "coordinate environmental clean-up." *See* Cannata Decl., Exh. 80 § 2.3; Calabrese Decl., Exh. C ¶ 48.

On September 16, 2001, Hillmann tested the asbestos content of the dust. *See* Cannata Decl., Exh. 81. Although testing revealed the dust to contain less than 1% asbestos, *see id.*, Exh. 81, "Brookfield [OLP] opted to use abatement methodologies and licensed asbestos abatement workers," *id.*, Exh. 81 at 3; *see also id.*, Exh. 80. There is also evidence that Hillmann advised Brookfield OLP that it should implement asbestos abatement methodologies. *See* Decl. Richard E. Leff Supp. NASD Mot. Summ. J. ("Leff NASD Decl."), Exh. G at 40:3-9. Hillmann did not test the pH levels of the airborne dust and initially tested only for asbestos. *See* Cannata Decl., Exh. 80. Brookfield OLP alleges that it did not supervise the cleanup work and that Hillmann developed the safety and remediation protocol for the building. *See* Smith Decl., Exh. C at 70:24-71:21. Hillmann recommended ETS and PAL to perform the bulk of the abatement work. *See* Cannata Decl., Exh. 80 at 3. BMS first performed work at 1 Liberty Plaza on October 25, 2001. *See* Keenan Decl., Exh. 15.

General Reinsurance Corp. ("General Re") and the National Association of Securities Dealers, Inc. ("NASD") leased various floors in 1 Liberty Plaza. *See* Decl. Richard E. Leff Supp. General Re Mot. Summ. J. ("Leff General Re Decl."), Exh. F; Leff NASD Decl., Exh. F at 21:5-14. Between September 11, 2001 and October 22, 2001, Brookfield OLP prohibited all tenants from reoccupying the building while testing and remediation were

6

performed. *See id.*, Exh. H.  General Re did not occupy its floor until June 2002. *See* Leff
General Re Decl., Exh. G at 18:20-19:3.  There is no evidence that NASD or General Re
developed the remediation and safety protocols for the cleanup work, influenced the decision to
treat the remediation as an asbestos abatement, or directly supervised Ropel's work. *See* Leff
NASD Decl., Exh. J at 49:8-12, Exh. F at 45:5-46:4, 84:3-10, 96:5-8; Leff General Re Decl.,
Exh. G at 32:17-33:8, 37:2-7, 44:3-10.

   Ropel worked at 1 Liberty Plaza for ETS for approximately 9 hours during the
week of September 17, 2001. *See* Decl. Richard E. Leff Supp. Hudson View East Condominium
Mot. Summ. J. ("Leff Hudson View East Decl."), Exh. F.  He performed cleanup work on the
exterior building. *See* Cannata Decl., Exh. 63 at 206:6-11.  Other workers removed broken
window frames, removed sheetrock, vacuumed and wiped up dust, and cleaned HVAC systems.
*See id.*, Exh. 17B, Exh. 18D.  He wore a half-face respirator, which would clog with dust. *See
id.*, Exh. 63 at 206:15-208:5.

### C.  101 Barclay Street

   101 Barclay Street is located one block north of the World Trade Center site and
was owned by The Bank of New York Company, Inc. ("BNY Mellon") on September 11, 2001.
*See* Decl. Shabbir R. Chaudhury Supp. BNY Mellon Mot. Summ. J. ("Chaudhury Decl."), Exh.
L at 13:17-22.  The building sustained broken windows and an infiltration of World Trade Center
dust and debris. *See* Cannata Decl., Exh. 19D.  BNY Mellon retained LawGibb Group, LLC
("LawGibb") as its environmental consultant. *See* Chaudhury Decl., Exh. L at 21:4-17.  BNY
Mellon did not limit the scope of the testing performed by LawGibb. *See id.*, Exh. L at 83:2-6.
Due to the presence of asbestos in the dust, LawGibb recommended a remediation plan calling

for the retention of an asbestos abatement contractor, which BNY Mellon accepted. *See id.*, Exh.
L at 83:7-13; Cannata Decl., Exh. 100 at 2.

            BNY Mellon hired Trade-Winds Environmental Restoration, Inc. ("Trade-
Winds"), an asbestos abatement contractor, to perform the remediation. *See* Chaudhury Decl.,
Exh. L at 23:3-9; Cannata Decl., Exh. 100. LawGibb issued "abatement procedures" to Trade-
Winds that were "designed to remove asbestos contamination from the building." *Id.*, Exh. 100.
Trade-Winds allegedly advised their employees that they would be working with asbestos, and
that they must wear Tyvek suits and respirators. *See* Chaudhury Decl., Exh. N at 95:17-24,
140:3-10 ("The only training in regards to Ground Zero that [Trade-Winds] gave to the guys was
every building we work in is to be considered an active asbestos abatement work area; suits,
respirators, PPE, HEPA vac, damp wipe[] at a minimum.").

            Ropel worked for Trade-Winds at 101 Barclay Street on October 1, 2001 for 8
hours. *See* Chaudhury Decl., Exh. C. He did not recall what type of work he performed at 101
Barclay Street. *See* Cannata Decl., Exh. 63 at 349:9-51:3. Other workers removed ceiling tiles
and sheetrock. *See id.*, Exh. 18B, Exh. 19D. Ropel wore a half-mask respirator and no
decontamination unit was available. *See id.*, Exh. 63 at 282:22-83:20.

    **D.**    **1 Wall Street**

            1 Wall Street is located approximately one block east and three blocks south of
the World Trade Center site. On September 11, 2001, BNY Mellon owned the building. *See*
Chaudhury Decl., Exh. J at 19:12-18. 1 Wall Street sustained an infiltration of dust and debris as
well as flooding in the basement. *See* Cannata Decl., Exh. 184 at 263:10-14, 271:10-16. BNY
Mellon hired LawGibb to assess the conditions and prepare a plan for its restoration. *See*
Chaudhury Decl., Exh. J at 17:6-17. LawGibb's initial environmental testing focused primarily

on asbestos levels, *see, e.g.*, Cannata Decl., Exh. 83, and revealed a concentration of asbestos in the dust but none in the air. *See* Chaudhury Decl., Exh. J at 49:3-50:9, 145:22-146:20. As a result, BNY Mellon decided to treat the building as contaminated with asbestos. *See id.*, Exh. J at 49:3-50:9.

BNY Mellon hired Trade-Winds, an asbestos abatement contractor, to perform the restoration. *See id.*, Exh. J at 46:19-22. Both LawGibb and BNY Mellon prescribed the operational procedures by which Trade-Winds performed the work. *See id.*, Exh. J at 48:2-14. LawGibb decided what type of protective equipment the workers were required to wear and both LawGibb and Trade-Winds supervisors monitored compliance. *See id.*, Exh. J at 152:7-24. Trade-Winds supervisors provided the workers with daily instructions on how to perform the cleanup work and controlled the day-to-day operations. *See id.*, Exh. N at 115:22-116:6, Exh. O at 112:5-20. In addition, Trade-Winds supervisors informed the workers that they may be working with toxic substances. *See id.*, Exh. O at 112:3-9.

Ropel worked at 1 Wall Street for Trade-Winds for 12.5 hours during the week of September 24, 2001. *See* Cannata Decl., Exh. 63 at 245:4-10. His work consisted of removing debris. *See id.*, Exh. 63 at 245:11-19. Other workers cleaned HVAC ducts, replaced air conditioning filters, and removed furniture and machinery from the building. *See id.*, Exh. 27 at 6, Exh. 28 at 6. Ropel wore a half-mask respirator while working. *See id.*, Exh. 63 at 246:10-13.

## E.    250 South End Avenue

250 South End Avenue is located one block south and one block west of the World Trade Center site, across West Street. On September 11, 2001, the building was owned by Hudson View East Condominium ("Hudson View East") and managed by RY Management Co., Inc. ("RY"). *See* Leff Hudson View East Decl., Exh. H at 19:4-11. The first floor consisted

9

of commercial space and the remaining units were residential condominiums. *See id.*, Exh. H at 25:11-25. The building sustained a light infiltration of dust, and damage to a 10th floor condominium unit from the wing of an airplane. *See id.*, Exh. H at 59:23-60:16, 62:13-63:1.

RY and Hudson View East were responsible for the common areas of the building, including the hallways, lobby, basement, roof, courtyard, and elevators. *See id.*, Exh. H at 27:13-18, 34:11-21. With the exception of the one condominium unit on the 10th floor, which sustained damage from an airplane wing, individual condominium unit owners took responsibility for the remediation and cleaning of their individual units. *See id.*, Exh. H at 27:13-18, 59:23-60:16, 68:23-70:4. RY retained numerous contractors to perform various work in the common areas of the building as well as the 10th floor condominium that sustained damage. *See id.*, Exh. H at 70:5-71:8. RY did not hire Pinnacle to perform any remediation work. *See id.*, Exh. H at 156:8-9.

According to Ropel's Local Union 78 work history report, he worked for Pinnacle at 250 South End Avenue for 66 hours during the week of October 11, 2001. *See id.*, Exh. F. Ropel alleges that he cleaned dust inside individual apartments. *See* Cannata Decl., Exh. 63 at 305:2-5. However, Hudson View East presents evidence that Pinnacle did not perform any work at the location. *See* Leff Hudson View East Decl., Exh. I ¶ 6. There is no evidence that Ropel performed any work inside the 10th floor apartment that sustained damage from the airplane wing or in any common areas controlled by RY and Hudson View East.

F.     **88 Greenwich Street**

88 Greenwich Street is located approximately three blocks south of the World Trade Center site. On September 11, 2001, the building was owned by 88 Greenwich LLC ("88 Greenwich") and managed by Monarch Management. *See* Decl. Frank A. Scanga Supp. 88

10

Greenwich Mot. Summ. J. ("Scanga Decl."), Exh. H at 12:18-13:6, 16:6-8. Black Diamonds
LLC ("Black Diamonds") was the developer of the residential units. *See id.*, Exh. H t 13:14-19.
On September 11, 2001, 88 Greenwich Street sustained an infiltration of dust but no structural
damage. *See id.*, Exh. H at 91:5-22; Cannata Decl., Exh. 63 at 227:18-23.

88 Greenwich hired One Source Environmental LLC "(One Source") to perform
environmental remediation in the interior of the building. *See* Scanga Decl., Exh. H at 31:22-
32:11. 88 Greenwich retained Environmental Monitoring and Consulting Associates ("EMCA")
to test the air and the debris for asbestos. *See id.*, Exh. H at 113:20-114:20. The test results
revealed no asbestos. *See id.*, Exh. H at 109:23-110:3, 115:17-24. 88 Greenwich and Black
Diamonds present evidence that Pinnacle was retained to clean the exterior of the building but
performed no work inside of 88 Greenwich Street. *See id.*, Exh. H at 41:23-42:12, 144:4-8,
179:12-18.

Ropel worked for Pinnacle at 88 Greenwich Street for a total of 22.5 hours during
the week of September 17, 2001. *See id.*, Exh. G. He claims to have performed cleaning and
debris removal. *See* Cannata Decl., Exh. 63 at 227:4-8, 228:6-19. While performing this work,
he wore a half-mask respirator and a decontamination unit was unavailable. *See id.*, Exh. 63 at
231:8-20, 235:10-12.

## G.    99 Church Street

99 Church Street is located two blocks north of the World Trade Center site. On
September 11, 2001, the building was owned by Moody's Holdings, Inc. ("Moody's"). *See*
Decl. John Cookson Supp. Moody's Mot. Summ. J. ("Cookson Decl."), Exh. F at 14:6-20.
Cushman & Wakefield, Inc. ("Cushman") managed the property. *See id.*, Exh. F at 14:1-15:10.
99 Church Street sustained an infiltration of dust but no structural damage. *See* Cannata Decl.,

11

Exh. 63 at 238:20-239:5.  Moody's hired ATC Associates ("ATC") to conduct air and water

quality testing between late September 2001 and February 2002. *See* Cookson Decl., Exh. F at

38:22-39:12.  There is no evidence that ATC tested the pH level of the dust. *See* Cannata Decl.,

Exh. 179.

        In addition, Moody's retained Pinnacle to perform dust remediation and cleaning.

Between September 19, 2001 and October 9, 2001 Pinnacle cleaned the building's exterior and

two offices that sustained a significant infiltration of dust. *See* Cookson Decl., Exh. F at 56:6-16,

63:16-64:5.  Pinnacle treated the job as an asbestos abatement because there were trace amounts

of asbestos in the dust tested by ATC. *See id.*, Exh. I at 14:10-15.  ATC provided Pinnacle with

a remediation protocol, which provided for the specific protective equipment to be worn, and

supervised the work to ensure compliance. *See id.*, Exh. I at 33:8-18, 37:17-20, 78:17-79:25.  No

representative of Moody's supervised Pinnacle's work. *See id.*, Exh. F at 81:10-19.

        Ropel worked for Pinnacle at 99 Church Street for Pinnacle for a total of 4 hours

during the week of September 17, 2001. *See id.*, Exh. B at 1.  Although he could not recall the

specific work he performed, Ropel testified that he performed general dust and debris removal at

each building in which he worked. *See* Cannata Decl., Exh. 63 at 236:9-13, 238:20-239:7.

While it is unclear from the record presented what protective equipment Ropel wore, Pinnacle

workers generally wore half-mask respirators with replaceable cartridges, Tyvek suit, and gloves.

*See* Cookson Decl., Exh. I at 42:10-16.

## II.    Standard of Review

        "The court shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue

12

of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In ruling on a motion for summary judgment, the court must view all evidence in the light most favorable to the nonmoving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford*, 391 F.3d at 83.  However, in deciding a motion for summary judgment, a District Court is not required to "scour the record on its own in a search for evidence" where the non-moving party fails to adequately present it. *CILP Assocs. LP v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 125 (2d Cir. 2013) (internal quotations and citations omitted).

## III.   Discussion

### A.   Exceptions to the Duty to Provide a Safe Workplace

Various Defendants argue that Ropel's claims under the New York Labor Law are barred by two related exceptions to the duty to provide a reasonably safe workplace.  The first exception applies to injuries sustained due to defective conditions that are "part of or inherent in" the very work being performed or conditions that are "readily observed by reasonable use of the senses in light of the worker's age, intelligence and experience." *Bombero v. NAB Constr. Corp.*, 10 A.D.3d 170, 171 (1st Dep't 2004) (holding no duty owed to employee who walked directly on exposed steel bars that were part of the construction) (citing *Gasper v. Ford Motor Corp.*, 13 N.Y.2d 104 (1963)).  The second exception applies where the particular defect giving rise to a plaintiff's injury was the very defect the injured plaintiff was hired to remediate. *See Kowalsky v. Conreco Co.*, 264 N.Y. 125, 128 (1934) ("An employee cannot recover for injuries received while doing an act to eliminate the cause of the injury.").

13

Ropel points to evidence demonstrating a significant focus on asbestos abatement at each building in which he worked. This is sufficient to raise a genuine issue of fact as to whether, in the terms of his hiring, he was made aware that the dust he was hired to remove was "high-alkaline" dust, or that removal of "high-alkaline" dust required different procedures and protections than those relevant to asbestos-containing material, or that Ropel was aware of the particular hazard posed by his work. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153, at *11-12 (S.D.N.Y. Sept. 9, 2014), I decline to grant the Defendants' motions on this basis.

## B. The Scope of the Duty Imposed by the New York Labor Law

Various Defendants argue that they owed no duty under the New York Labor Law because they were not owners, general contractors, or statutory "agents" under section 200 or section 241(6) of the New York Labor Law. In order for a party to have a duty under section 200, it must "have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Russin v. Louis N. Picciano & Son*, 54 N.Y.2d 311, 317 (1981). Likewise, a party will be considered a statutory "agent" under section 241(6) if it has the authority to control the "injury producing activity." *Id.* at 317-18.

Ropel has presented evidence, sufficient to raise a triable issue of fact, that the Environmental Consultant Defendants either developed the remediation protocols (including the required personal protective equipment to be worn by the workers) or influenced the decision to treat the remediation as an asbestos abatement in the respective buildings for which they were retained. *See* Goldstein Decl., Exh. S at 103:18-105:18; Kauffman Decl., Exh. O ¶ 8; Calabrese Decl., Exh. C ¶¶ 32, 43-46; Leff NASD Decl., Exh. G at 40:3-9; Cannata Decl., Exh. 4 at 106:3-

14

107:16, Exh. 80 at 3.  Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *12-14, I hold that Ropel has raised a triable issue of fact as to whether the Environmental Consultant Defendants had the authority to "avoid or correct" the alleged use of inadequate respiratory equipment, *Russin*, 54 N.Y.2d at 317, and therefore owed a duty to Ropel under the Labor Law.[5]

However, Ropel has failed to raise an issue of fact with respect to BMS's duty to him at 1 Liberty Plaza and 2 World Financial Center.  There is substantial evidence that BMS neither employed nor supervised Ropel at 2 World Financial Center.  *See* Keenan Decl., Exh. 22, Exh. 23.  In addition, BMS was not present at 1 Liberty Plaza on the single day Ropel worked at that location.  *See* Keenan Decl., Exh. 15; Leff Hudson View East Decl., Exh. F.   In opposition, Ropel has failed to present any controverting evidence.  Accordingly, I grant the motion for summary judgment filed by BMS with respect to Ropel's New York Labor Law claims arising from his work at 1 Liberty Plaza and 2 World Financial Center.

Ropel has also failed to raise an issue of fact with respect to his claims against Hudson View East and RY arising from his work 250 South End Avenue.  Hudson View East and RY have presented substantial evidence that they did not hire Pinnacle, Ropel's alleged employer at the location, and therefore lacked the authority to control or influence the safety procedures applicable to Ropel's work.  *See* Leff Hudson View East Decl., Exh. H at 156:8-9. Ropel has failed to point to any evidence that he worked in any areas of the building for which Hudson View East and RY were responsible for remediation.  *See* Cannata Decl., Exh. 63 at

---

[5] Similarly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *14-15, I reject Hillmann's argument that it did not owe a duty of care to Ropel as a non-contracting third party.  Ropel has raised an issue of fact that the Environmental Consultant Defendants exacerbated the existing hazard by influencing the choice of respiratory equipment incapable of handling that particular hazard and therefore breached an independent duty of care owed to Ropel by "launch[ing] a force or instrument of harm." *Espinal v. Melville Snow Contractors*, 98 N.Y.2d 136, 140 (2002).

305:2-5; Leff Hudson View East Decl., Exh. H at 27:13-18, 34:11-21, 59:23-60:16, 69:23-71:8.

Accordingly, I hold that Hudson View East and RY did not owe a duty to Ropel under the New

York Labor Law and grant their motion in its entirety.

Ropel has also failed to raise an issue of fact with respect to his claims against

General Re and NASD arising from his work 1 Liberty Plaza. Both defendants have presented

substantial evidence that they lacked the authority to control the choice of personal protective

equipment worn by workers or the safety procedures implemented by the contractors. *See* Leff

NASD Decl., Exh. F at 45:5-46:4, 84:3-10, 96:5-8, Exh. H, Exh. J at 48:20-49:20; Leff General

Re Decl., Exh. G at 18:20-19:3, 32:17-33:8, 37:2-7, 44:3-10.  In opposition, Ropel points to no

contrary evidence.  Accordingly, I hold that neither General Re nor NASD owed a duty to Ropel

under the New York Labor Law and grant their motions in their entirety.

Finally, Ropel has not raised a triable issue of fact with respect to IET's duty at 2

World Financial Center.  IET has presented evidence that the scope of its work was limited to

one-time inspections of the HVAC systems and post-cleanup air monitoring.  *See* Stanley Aff. ¶¶

4, 14-15.  Further, IET has presented evidence that it neither developed safety and remediation

protocols nor supervised Ropel's work. *See id.* ¶¶ 11-15.  Ropel has failed to point to any

contrary evidence.  Accordingly, I hold that IET owed no duty to Ropel and grant its motion for

summary judgment in its entirety.

### C.    New York Labor Law Section 200

Section 200 of the New York Labor Law codifies[6] the common law duty "to

protect the health and safety of employees." *In re Joint E. & S. Dist. Asbestos Litig.*, 827 F.

Supp. 1014, 1052–53 (S.D.N.Y.1993), *aff'd in part rev'd in part on other grounds*, 52 F.3d 1124

---

[6] Because section 200 is a codification of common law negligence, courts analyze the claims simultaneously. *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 455 n. 15 (S.D.N.Y. 2005) (collecting cases).

16

(2d Cir. 1995).  Specifically, section 200 requires that a workplace "be so constructed, equipped, arranged, operated and conducted as to provide a reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places."  N.Y. Labor Law § 200(1) (McKinney 2014).

Section 200 has two disjunctive standards for determining liability. *See Chowdury v. Rodriguez*, 57 A.D.3d 121, 128 (2d Dep't 2008).  When a plaintiff's injury "arises out of defects or dangers in the methods or materials of the work," the "means and methods" standard will apply. *Id.* By contrast, where a plaintiff's injuries arise out of the "condition of the premises rather than the methods or manner of the work," the "premises liability" standard applies. *Id.* If an injury arises from both sets of conditions, concurrently, the proofs are to be evaluated under both standards. *See Reyes v. Arco Wentworth Mgmt. Corp.*, 83 A.D.3d 47, 52 (2d Dep't 2011) ("When an accident is alleged to involve defects in both the premises and the equipment used at the work site, the property owner moving for summary judgment with respect to causes of action alleging a violation of Labor Law § 200 is obligated to address the proof applicable to both liability standards.").

Ropel alleges that his injuries arose from two concurrent causes: (1) the toxic "alkaline-based" dust and debris that spewed out of the collapsed World Trade Center buildings on September 11, 2001 and that was present in each of the relevant buildings, and (2) the use of respiratory equipment and safety procedures inappropriate for the particular hazard posed by the "alkaline-based" dust.  Accordingly, I have to evaluate the proofs relevant to both the "means and method" standard and the "premises liability" standard. *See id.*

1.    **The "Means and Methods" Standard**

17

Where a plaintiff's claim arises out of an alleged defect or condition in the "methods or materials" of the work, a party subject to Labor Law § 200 cannot be held liable unless "it is shown that the party to be charged exercised some supervisory control over the operation." *Ross v. Curtis-Palmer Hydro-Elec. Co.*, 81 N.Y.2d 494, 505 (1993); *see also Persichilli v. Triborough Bridge & Tunnel Auth.*, 16 N.Y.2d 136 (1965).

The Owner Defendants adequately show that they did not exercise supervisory control over the work giving rise to Ropel's injuries. Ropel's opposition papers fail to rebut the Owner Defendants' showing. Accordingly, I hold that no genuine issue of material fact under the Section 200 "means and methods" standard exists. Owners Defendants' motions for summary judgment are granted to the extent they seek dismissal of Ropel's claims under the Section 200 "means and methods" standard.

However, I deny the Environmental Consultant Defendants' motions for summary judgment under the "means and methods" standard. Ropel points to evidence that, at each of the relevant buildings, the Environmental Consultant Defendants played a role in the choice of respiratory equipment and safety procedures employed by the contractors that hired Ropel to perform the clean-up work. *See* Goldstein Decl., Exh. S at 103:18-105:18; Kauffman Decl., Exh. O ¶ 8; Calabrese Decl., Exh. C ¶¶ 32, 43-46; Leff NASD Decl., Exh. G at 40:3-9. This is sufficient to raise a triable issue of fact as to whether the Environmental Consultant Defendants "exercised supervisory control over the means and method of the work." *Ross*, 81 N.Y.2d at 505.

## 2.    The "Premises Liability" Standard

Where a plaintiff's claim arises out of the condition of the premises, a party is liable if (1) it created the dangerous condition causing the injury or (2) failed to remedy a

18

dangerous or defective condition of which he or she had actual or constructive notice. *See Ortega v. Puccia*, 57 A.D.3d 54, 61 (2d Dep't 2008). Furthermore, the statutory duty to maintain a reasonably safe workplace implies a duty to make timely and adequate inspections for dangers that may reasonably be discovered. *DiNunzio v. Ken-Jil Elec. Contractors, Inc.*, 473 F. Supp. 2d 485, 487 (S.D.N.Y 2007). The question of whether a defendant "has conducted reasonable inspections of the premises is usually a question of fact for the jury to resolve in determining whether defendants fulfilled their duty to maintain the premises in a reasonably safe condition." *Dufrain v. Hutchings*, 112 A.D.3d 1212, 1212 (3d Dep't 2013).

Ropel presents evidence that the Owner Defendants either retained environmental consultants and contractors specifically to perform asbestos abatement and monitoring or played some role in the decision to implement asbestos abatement procedures at the worksites, leading to the failure to implement methods and equipment to assure safe working conditions relating to the alleged alkaline condition of the infiltrating dust. *See, e.g.*, Goldstein Decl., Exh. M; Kauffman Decl., Exh. O ¶¶ 5-7; Chaudhury Decl., Exh. L at 23:3-9, 83:7-13, Exh. J at 48:2-50:9; Scanga Decl., Exh. H at113:20-114:20; Cookson Decl., Exh. I at 14:10-15; Cannata Decl., Exh. 80, Exh. 81, Exh. 83, Exh. 100 at 2. It is true that certain Owner Defendants did not initially limit the scope of the consultants' work only to asbestos testing and monitoring. *See, e.g.*, Chaudhury Decl., Exh. L at 83:2-6. However, on the record before me, I cannot hold as a matter of law that the Owner Defendants played no role in the allegedly unreasonable decision to use asbestos-specific safety equipment and procedures. Accordingly, for the reasons previously elaborated in *In re World Trade Center Lower Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *18-19, I deny the Owner Defendants' motions for summary judgment under section 200 of the Labor Law.

19

**D.     New York Labor Law Section 241(6)**

Section 241(6) of the New York Labor Law provides that:

> All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places. The commissioner may make rules to carry into effect the provisions of this subdivision, and the owners and contractors and their agents for such work . . . shall comply therewith.

N.Y. Labor Law § 241(6) (McKinney 2014).  The statute imposes a non-delegable duty upon

owners, general contractors, and their agents, to ensure worksite compliance with the New York

Industrial Code.  *See Morris v. Pavarini Constr.*, 22 N.Y.3d 668, 673 (2014); *Rizzuto v. L.A.*

*Wenger Constr. Co.*, 91 N.Y.2d 343, 348 (1998).  To prove vicarious liability under section

241(6), a plaintiff must demonstrate that (1) the work giving rise to the injury was in connection

with "construction, excavation or demolition"; and (2) a violation of an applicable regulation

implementing section 241(6) caused the plaintiff's injury.  *See Nagel v. D & R Realty Corp.*, 99

N.Y.2d 98, 101 (2002); *Rizzuto*, 91 N.Y.2d at 348-50.  These requirements are addressed in turn.

**1.      "Construction, Excavation or Demolition"**

For the reasons stated in *In re World Trade Center Lower Manhattan Disaster*

*Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *20-23, I hold that Ropel's work at 88

Greenwich Street, 99 Church Street, 1 Liberty Plaza, 101 Barclay Street, and 1 Wall Street was

not sufficiently related to "construction, excavation or demolition" to support a claim under

section 241(6) of the New York Labor Law.  None of these buildings sustained structural

damage and the primary damage was limited to an infiltration of World Trade Center dust.  *See*

Cannata Decl., Exh. 7 at 7-2, Exh. 19D, Exh. 19H, Exh. 63 at 238:20-239:5, Exh. 184 at 263:10-

14, 271:10-16; Scanga Decl., Exh. H at 91:5-22.  The work performed to remediate these

20

buildings consisted exclusively of cleaning the dust and removing contaminated debris, tiles and sheetrock. *See* Cannata Decl., Exh. 17B, Exh. 18B, Exh. 18D, Exh. 19D, Exh. 27 at 6, Exh. 28 at 6, Exh. 63 at 227:4-8, 228:6-19, 236:9-13, 238:20-239:7, 245:11-19, 206:6-11. Accordingly, I grant the Defendants' motions for summary judgment and dismiss Ropel's section 241(6) claims arising from his work at 88 Greenwich Street, 99 Church Street, 1 Liberty Plaza, 101 Barclay Street, and 1 Wall Street

However, Ropel has raised a question of fact as to whether his work performed at 2 World Financial Center was sufficiently connected to "construction, excavation or demolition" to support his section 241(6) claims. Importantly, the particular task performed by a plaintiff need not constitute "construction, excavation or demolition" so long as the task is sufficiently connected to a larger project that qualifies as "construction, demolition, or excavation." *See Prats v. Port Authority of N.Y. & N.J.*, 100 N.Y.2d 878, 882 (2003); *McNeil v. La Salle Partners*, 52 A.D.3d 407, 409 (1st Dep't 2008). 2 World Financial Center suffered hundreds of broken windows, demolished walls, and the destruction of the "Winter Garden." *See id.*, Exh. 139. The remediation effort required substantial renovations, including the removal of wall studs, the demolition of walls, and the construction of tunnels for the removal of debris. *See, e.g.*, Cannata Decl., Exh. 53 at 239:2-23, Exh. 54 at 352:23-353:6, Exh. 64 at 120:23-121:16. Accordingly, with respect to 2 World Financial Center, I must address the second prong of section 241(6) liability.

### 2.    Violation of Applicable Industrial Code Provision

Liability under section 241(6) also requires a violation of Part 23 of the New York Industrial Code, the regulations implementing section 241(6). *See Kaczmarek v. Bethlehem Steel Corp.*, 884 F. Supp. 768, 779 (W.D.N.Y. 1995); *Nostrom v. A.W. Chesterton Co.*, 59 A.D.3d 159

21

(1st Dep't 2009). It is insufficient to allege violations of OSHA regulations, *see Rizzuto*, 91

N.Y.2d at 351 n.1, or Part 12 of the New York Industrial Code, *see Kagan v. BFP One Liberty

Plaza*, 60 A.D.3d 531, 532 (1st Dep't 2009). Further, the provision of Part 23 alleged to have

been violated must "mandate compliance with concrete specifications and not simply declare a

general safety standard or reiterate common-law principles." *Misicki v. Caradonna*, 12 N.Y.3d

511, 515 (2009); *see also Ross*, 81 N.Y.2d at 505 (1993). The provision must add a "specific,

positive command" beyond the duty of reasonableness imposed by the common law. *Ross*, 81

N.Y.2d at 504.

　　　　　For the reasons previously elaborated in *In re World Trade Center Lower

Manhattan Disaster Site Litigation*, No. 09-cv-680, 2014 WL 4446153 at *26-27, I grant the

Defendants' motions with respect to Ropel's claims under section 241(6) of the Labor Law

alleging violations of sections 23-1.7(g) and 23-2.1(b) of the Industrial Code. Ropel has failed to

point to any facts that suggest he worked inside "enclosed" areas with "restricted means of

egress," as required to be considered a "confined, unventilated area" as that term has been

interpreted by New York courts. N.Y. Comp. Codes R. & Regs. tit. 12, §§ 12-1.3(f), 23-1.7(g)

(2014); *Ceverizzo v. City of New York*, 116 A.D.3d 469, 470-71 (1st Dep't 2014); *Kagan*, 60

A.D.3d at 532.

　　　　　I deny the Defendants' motions with respect to Ropel's claims alleging violations

of sections 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1) of the Industrial Code. Those

provisions impose sufficiently "specific, positive commands" to serve as predicate violations

under section 241(6), *Ross*, 81 N.Y.2d at 504, and Ropel has presented evidence, sufficient to

raise a triable issue of fact, that his injuries were caused by their violation.

**IV.    Conclusion**

In summary, for the foregoing reasons, the motion filed by Hudson View East and RY is GRANTED in its entirety with respect to both Ropel's section 200 and section 241(6) claims arising from his work at 250 South End Avenue.

The motion filed by 88 Greenwich and Black Diamonds is DENIED with respect to Ropel's section 200 claim arising from his work at 88 Greenwich Street. The motion is GRANTED with respect to Ropel's section 241(6) claim arising from his work at 88 Greenwich Street.

The motion filed by General Re is GRANTED in its entirety with respect Ropel's section 200 and section 241(6) claims arising from his work at 1 Liberty Plaza.

The motion filed by NASD is GRANTED in its entirety with respect to Ropel's section 200 and section 241(6) claims arising from his work at 1 Liberty Plaza.

The motion filed by Hillmann is DENIED with respect to Ropel's section 200 claims arising from his work at 1 Liberty Plaza and 2 World Financial Center. The motion is GRANTED with respect to Ropel's section 241(6) claims arising from his work at 1 Liberty Plaza. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by BMS is GRANTED in its entirety with respect to Ropel's section 200 and section 241(6) claims arising from his work at 1 Liberty Plaza and 2 World Financial Center.

The motion filed by Weston is DENIED with respect to Ropel's section 200 claims arising from his work at 2 World Financial Center. The motion is GRANTED with

23

respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by Merrill Lynch is DENIED with respect to Ropel's section 200 claims arising from his work at 2 World Financial Center. The motion is GRANTED with respect to his section 241(6) claims, arising from his work at 2 World Financial Center, alleging violations of Industrial Code Rules 23-2.1(b) and 23-1.7(g), and DENIED with respect to his section 241(6) claims alleging violations of Industrial Code Rules 23-1.5(c)(3), 23-1.7(h), 23-1.8(c)(4), and 23-1.8(b)(1).

The motion filed by Moody's is DENIED with respect to Ropel's section 200 claims arising from his work at 99 Church Street. The motion is GRANTED with respect to Ropel's section 241(6) claims arising from his work at 99 Church Street.

The motion filed by Brookfield is DENIED with respect to Ropel's section 200 claims arising from his work at 1 Liberty Plaza. The motion is GRANTED with respect to Ropel's section 241(6) claims arising from his work at 1 Liberty Plaza.

The motion filed by BNY Mellon is DENIED with respect to Ropel's section 200 claims arising from his work at 101 Barclay Street and 1 Wall Street. The motion is GRANTED with respect to Ropel's section 241(6) claims arising from his work at 101 Barclay Street and 1 Wall Street.

The motion filed by IET is GRANTED in its entirety with respect to Ropel's section 200 and section 241(6) claims arising from his work at 2 World Financial Center.

24

Accordingly, the Clerk shall mark the following motions in No. 06-cv-1520 as terminated: Doc. No. 163, Doc. No. 167, Doc. No. 171, Doc. No. 175, Doc. No. 179, Doc. No. 183, Doc. No. 199, Doc. No. 203, Doc. No. 206, Doc. No. 215, and Doc. No. 224.  The Clerk shall enter judgment in case number 06-cv-1520 dismissing the Complaint against Hudson View East, RY, General Re, NASD, BMS, and IET (collectively, the "Dismissed Defendants"), with costs to the Dismissed Defendants.

Ropel shall file an Amended Complaint by December 5, 2014, consistent with this Order and Opinion, dropping the Dismissed Defendants from the caption and the allegations and retaining the paragraph numbering of the existing complaint.  Defendants' Answers need not be amended.

SO ORDERED.

Dated:      New York, New York
            November 13, 2014

ALVIN K. HELLERSTEIN
United States District Judge

25